**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 09-CV-01340-WYD-CBS

JACK P. KATZ, STEVEN A. STENDER and INFINITY
CLARK STREET OPERATING, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

ERNEST A GERARDI, JR.,
RUTH ANN M. GILLIS,
NED S. HOLMES,
ROBERT P. KOGOD,
JAMES H. POLK III,
JOHN C. SCHWEITZER,
R. SCOT SELLERS,
ROBERT H. SMITH,
STEPHEN R. DEMERITT,
CHARLES MUELLER, JR.,
CAROLINE BROWER,
MARK SCHUMACHER,
ALFRED G. NEELY,
ARCHSTONE-SMITH OPERATING TRUST,
ARCHSTONE-SMITH TRUST,
TISHMAN SPEYER ARCHSTONE SMITH
MULTIFAMILY SERIES 1 TRUST and
TISHMAN SPEYER DEVELOPMENT
CORPORATION,

Defendants.

---

**AMENDED CLASS ACTION COMPLAINT**

---

Plaintiffs Jack P. Katz, Steven A. Stender and Infinity Clark Street Operating

("Plaintiffs"), by their attorneys, for their amended class action complaint against

Archstone-Smith Operating Trust, Archstone-Smith Trust, Ernest A. Gerardi, Jr., Ruth

Ann M. Gillis, Ned S. Holmes, Robert P. Kogod, James H. Polk III, John C. Schweitzer,

R. Scot Sellers, Robert H. Smith, Stephen R. Demeritt, Charles Mueller, Jr., Caroline Brower, Mark Schumacher, Alfred G. Neely, Tishman Speyer Archstone Smith Multifamily Series 1 Trust ("Tishman Speyer Trust") and Tishman Speyer Development Corporation ("Tishman Speyer"), (hereinafter sometimes collectively referred to as "Defendants"), allege upon knowledge as to their own acts, and upon information and belief as to all other matters, based upon the investigation, conducted by and through their attorneys, that included, *inter alia*, reviewing Securities Exchange Commission filings, press releases, analyst reports, news articles, communications from Defendants and other materials, as follows:

## I.    NATURE OF THE ACTION

1.    In the Spring of 2007, Defendants were negotiating to take the publicly-held Archstone Smith REIT (the "REIT") private (the "Merger"). The Archstone Smith REIT was then publicly-traded and owned 89% of the Archstone Smith Operating Trust (the "Archstone UPREIT" or "UPREIT"), the owner-operator of a valuable portfolio of residential rental properties. Plaintiffs and other Class Members were the owners of the balance of the UPREIT in the form of A-1 Units. The A-1 Units had valuable economic rights (including tax benefits and other economics rights and features explained at ¶¶ 52 to 57 *infra*) that made them much more valuable than the common stock of the REIT despite the fact that both the Units and the common stock represented an ownership interest in the same property portfolio.

2.    For the Merger to succeed, Defendants had either to off-set or eliminate the considerable tax benefits held by the A-1Unit holders. Defendants did not want to be responsible for the multi-million dollar financial obligations owed to the non-insider A-

1 Unit Holders upon the happening of certain transactions contemplated by Defendants in connection with the Merger.

3. Accordingly, Defendants structured the Merger in such a way as to accomplish both: off-set the cost of the tax benefits owed to the A-1 Unit holders *and* eliminate those non-insider A-1 Unit holders' tax and other benefits at the same time.

4. What occurred was a multi-step transaction involving the Merger in August 2007 between an acquisition company set up by defendants and the UPREIT. The Merger allowed Defendants to implement the changes to governing documents which eliminated the economic benefits of the A-1 Units, the first step of a "fundamental change" to the original A-1 Units that transformed them into "new A-1 Units".

5. In the second step of the Merger, Defendants forced a transaction upon the Plaintiffs and Class Members which coerced them into either accepting a $60.75 per new A-1 unit cash-out (the same price that the economically inferior REIT common shares were receiving, a price that did not reflect the A-1 Unit's tax, liquidity and other financial benefits), and incurring a huge capital gains tax liability, or receiving a new security, the Series O Preferred ("O Units") in the company that rose out of the Merger. Under either scenario, the non-insider A-1 Unit holders suffered damages in at least the hundreds of millions of dollars.

6. The size of the tax benefits obligations avoided by Defendants through this scheme approached a half billion dollars, or approximately 300 million dollars on a present value basis. This amount was larger than the equity contribution of either Tishman-Speyer or Lehman Brothers to the Merger.

7.      Plaintiffs Jack P. Katz, Steven A. Stender and Infinity Clark Street Operating were holders of the A-1 Units fundamentally changed through the series of transactions summarized above and described in detail below, and bring this action pursuant to §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77k, 77l(a)(2), and 77o, §§10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, respectively, individually and as a class action.   The claims arise out of the Merger and related agreement (the "Merger Agreement") among Archstone-Smith UPREIT, Archstone-Smith Trust, Tishman Speyer and Lehman Brothers (Tishman Speyer and Lehman Brothers are referred to collectively as the "Tishman-Lehman Partnership").[1]

8.      Plaintiffs bring these claims on behalf of all persons who were holders of A-1 or similar common units of Archstone UPREIT ("A-1 Unit holders") on May 27, 2007 (the date of the announcement of the signed Merger Agreement) whose original A-1 Units were converted to new A-1 Units with fundamentally different and inferior economic rights and later were either exchanged for cash upon closing of the Merger of the Archstone REIT, or converted to Series O Preferred Units in a private company owned by the Tishman-Lehman Partnership on October 5, 2007 (the "Class").

9.      The Class is divided into two subclasses: (a) the "Cash-Out Subclass" consisting of all persons whose original A-1 Units were fundamentally changed into new A-1 Units by the Merger of the Archstone UPREIT in August 2007, and who later "elected" in the "forced election" to sell those A-1 Units for the same $60.75 price

---

[1] The Merger Agreement was signed by Michael B. Benner, Vice President and Secretary of Tishman Speyer and the River entities, and by Charles E. Mueller, Chief Financial Officer of Archstone and the Archstone-Smith Operating Trust.

received by the holders of REIT common stock and (b) the "Series O Subclass" consisting of all persons who, in the "forced election," exchanged their new A-1 Units for Series O units issued pursuant to a materially defective Registration Statement and Prospectus that contained false and/or misleading statements by Defendants.  Both subclasses assert claims under §§ 11, 12(2) and 15 of the Securities Act and §10(b) of the Exchange Act and Rule 10b-5 thereunder.

10.     The Class Members (of both subclasses) were A-1 Unit holders of the Archstone UPREIT, who are former property owners, or investors in property owning companies, that contributed properties (and/or equity in property holding companies) to the Archstone UPREIT, or its predecessor, Charles E. Smith Residential Realty L.P. (the "Smith UPREIT"), in exchange for equity interests in the Archstone UPREIT (or its predecessor the Smith UPREIT) in the form of common units (the "original A-1 Units").

11.     More specifically, pursuant to the Merger Agreement and the materially false and misleading Prospectus/Information Statement ("Prospectus") and Registration Statement issued as part of the Merger, Defendants coerced Plaintiffs and members of the Class into an exchange of their original A-1 Units for less valuable new A-1 Units with fundamentally different economic rights, and thereafter coerced the holders of these new A-1 Units into either a below value sale of the A-1 Units for $60.75 per A-1 Unit, which sale had substantial tax consequences, or a purchase of Series O Units that Defendants knew were of a much lesser value.

12.     The original A-1 Units underwent a unilaterally imposed fundamental change at the time the Merger between the UPREIT and a subsidiary company formed by the Lehman-Tishman Partnership.  As a result of the Merger, these original A-1 Units

owned by Plaintiffs and the Class remained A-1 Units in name only. Rather than have the characteristics of tax indemnification, dividend rights and liquidity attached to the original A-1 Units, the new A-1 Units had none of those economic rights. Instead, Defendants took those material rights away, giving the new A-1 Units fundamentally different and materially inferior characteristics, and substantially decreasing their value.

13.   Thus, instead of the original A-1 Units that provided tax indemnification, liquidity and dividends, Defendants unilaterally eliminated those units and, in their place, forced on Plaintiffs and Class Members fundamentally changed new A-1 Units that would result in a huge tax liability if cashed out as "offered" by Defendants, or would cause A-1 Unit holders to suffer immediate loss by acquiring Series O Units in exchange, units which are entirely illiquid, provide no dividends, and suffered a massive diminution in value at the time of the Merger, which valuation has continued to decrease substantially since closing of the Merger.

14.   As explained more fully below, Defendants failed to include information in the Prospectus/Information Statement and the Registration Statement, information without which Plaintiffs and Class Members were unable to make a reasonable and informed decision as to their "election," thereby rendering both the Prospectus and Registration Statement materially false and misleading. The omitted information was necessary to make the other statements contained in the Prospectus and Registration Statement not misleading.

15.   Plaintiffs and the Class suffered damages caused by the violations of the statutes alleged below and loss compensable under the statutes which give rise to the claims asserted below.

16.    Because Defendants violated §§ 11, 12(a)(2) and/or 15 of the Securities Act by issuing a materially false and misleading Prospectus and Registration Statement, Plaintiffs seek compensatory damages and rescissory damages for all persons that held the original A-1 or similar common units who were or will be injured by Defendants' wrongful conduct.

17.    Further, because Defendants violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and Individual Defendants violated § 20(a) of the Exchange Act, by deceiving holders of original A-1 Unit holders to exchange those A-1 Units for cash and/or Series O Units through a false and misleading Prospectus and Registration Statement.  Plaintiffs and the Class seek compensatory damages for all persons that held the original A-1 or similar common units who were or will be damaged by Defendants' wrongful conduct.

## II.    PARTIES

### A. Plaintiffs.

18.    Plaintiff Jack P. Katz is a resident of Cook County, Illinois and was an owner of both original and new A-1 Units at all relevant times described herein.  In the forced election, Katz "elected" to cash-out his new A-1 Units and receive $60.75 per unit after the closing of the Merger.

19.    Plaintiff Steven A. Stender is a resident of Cook County, Illinois and was an owner of both original and new A-1 Units at all relevant times described herein.  In the forced election, Stender "elected" to cash-out his new A-1 Units and receive $60.75 per unit after the closing of the Merger.

20.    Plaintiff Infinity Clark Street Operating is an Illinois general partnership with its principal place of business in Cook County, Illinois.  Infinity Clark Street Operating is the successor in interest to Infinity Clark Street Operating, L.L.C., an Illinois limited liability company.  Infinity was an owner of both original and new A-1 Units at all relevant times described herein In the forced election.  Infinity converted its new A-1 Units to newly issued Series O Preferred Units on a one for one basis.

**B. Defendants.**

21.    Defendant Ernest A. Gerardi, Jr. was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

22.    Defendant Ruth Ann M. Gillis was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

23.    Defendant Ned S. Holmes was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

24.    Defendant Robert P. Kogod was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

25.    Defendant James H. Polk III was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

26.    Defendant John C. Schweitzer was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

27.    Defendant R. Scot Sellers was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times, as well as the Chairman and Chief Executive Officer of the Archstone REIT and the Archstone UPREIT.  As an officer of

the Archstone REIT and the Archstone UPREIT he will receive monetary benefits from the Merger in addition to the Merger consideration.

28.    Defendant Robert H. Smith was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

29.    Defendant Stephen R. Demeritt was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

30.    Defendant Charles Mueller, Jr. was the Chief Financial Officer of the Archstone REIT and the Archstone UPREIT at all relevant time.

31.    Defendant Caroline Brower was an Executive Vice President and General Counsel of the Archstone REIT and the Archstone UPREIT at all relevant times.

32.    Defendant Mark Schumacher was the Senior Vice President and Chief Accounting Officer of the Archstone REIT and the Archstone UPREIT at all relevant times.

33.    Defendant Alfred G. Neely was the Chief Development Officer and President of the Charles E. Smith Division of the Archstone REIT and the Archstone UPREIT at all relevant times

34.    The individual directors and officer Defendants are sometimes collectively referred to as the "Individual Defendants," and all have statutory liability under the 1933 Securities Act as signatories of the materially misleading Registration Statement.  In addition, as contributors to the Prospectus, and by virtue of the group pleading doctrine, all Defendants can be charged with liability for materially false and misleading statements in the Prospectus.

35.     Defendant Tishman Speyer is a corporation existing under the laws of the state of Delaware which, through affiliates: (1) owned and controlled River Holding LP, an entity with which the Archstone REIT merged; and (2) owned and controlled River Trust Acquisition (MD) LLC, an entity with which the Archstone UPREIT merged. Defendant Tishman Speyer was an offeror and/or solicitor of the exchange of shares offered pursuant to the Prospectus and Registration Statement.

36.     Defendant Archstone REIT was engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in metropolitan areas throughout the United States including, *inter alia*, Chicago, Boston, New York and Washington, D.C.  The Archstone REIT was organized under Maryland law and maintained its headquarters at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112.  It owned approximately 89% of the outstanding units of Archstone UPREIT, and was the sole trustee of the Archstone UPREIT.  Its relation with the Archstone UPREIT was governed by the Declaration of Trust of the Archstone UPREIT and all applicable common law and the statutory law of the state of Maryland. Defendant Archstone REIT is an issuer and was an offeror and/or solicitor of the exchange of shares offered pursuant to the Prospectus and Registration Statement.

37.     Defendant Archstone UPREIT was structured as an umbrella partnership real estate investment trust with its principal office at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112.   The Archstone UPREIT was organized under Maryland law.  Plaintiffs and members of the Class owned interests known as A-1 Units in the Archstone UPREIT.  Defendant Archstone UPREIT was an issuer and an offeror and/or solicitor of the exchange of shares offered pursuant to the Prospectus and

Registration Statement, and also issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public contained in the Prospectus and Registration Statement, which misrepresented or failed to disclose, *inter alia*, the information set forth below.

38.    Defendant Tishman Speyer Archstone-Smith Multifamily Series I Trust is a Maryland REIT with its principal place of business in Colorado.  As part of the Merger, Archstone-Smith was merged into the Tishman-Speyer Trust, with the Tishman-Speyer Trust surviving the Merger.  As part of the merger, the Tishman-Speyer Trust became sole trustee of the Archstone UPREIT and is legally obligated to assume the rights and obligations of the Archstone-Smith Trust.  Defendant Tishman-Speyer jointly controls the Tishman Speyer Trust with non-defendant Lehman Brothers.  River Acquisition assigned its rights under the Merger Agreement to the Tishman-Speyer Trust.

**C. Related Entities.**

39.    River Holding LP wholly-owns River Acquisition (MD) LP, which in turn owns River Trust Acquisition (MD) LLC.  River Holding was formed by Tishman Speyer in connection with the Merger.  River Holding is jointly-controlled by Tishman and Lehman Brothers.

40.    River Trust Acquisition (MD) LLC's was also formed by Tishman Speyer in connection with the Merger.  River Trust's sole purpose was to merge into the Archstone UPREIT and provide cover for the resulting amendment – done without the requisite consent of the A-1 Unit holders – of the Declaration of Trust.  At the closing date, River Trust Acquisition merged into the Archstone UPREIT with the Archstone

UPREIT surviving the Merger.   After River Trust Acquisition, LLC merged into the Archstone UPREIT, River Trust Acquisition was subsumed.   There was no business purpose for this Merger other than to provide a mechanism to amend the Declaration of Trust and force out the A-1 Unit holders without first obtaining their consent.

41.    Lehman Brothers is a corporation existing under the laws of the State of Delaware which, through affiliates, jointly-owned and controlled: (1) River Holding LP; (2) River Trust Acquisition (MD) LLC; (3) River Acquisition (MD), LP; and (4) Tishman Speyer Archstone Smith Multifamily Series I Trust with Defendant Tishman-Speyer. Each of these entities was involved in the Merger that resulted in the forcing out of the A-1 Unit holders.   On September 15, 2008, Lehman Brothers Holdings Inc. commenced a case under 11 U.S.C. § 101, *et seq.* in the Bankruptcy Court for the Southern District of New York.   As a result, all lawsuits against Lehman are stayed pursuant to Section 362 of the Bankruptcy Code, 11 U.S.C. §§ 362(a)(1), 362(a)(3).

**D. Defendants' Collective and Group Activates In Furtherance of the Violations Alleged herein.**

42.    By the acts, transactions, and courses of conduct alleged in this amended complaint, Defendants, individually and as part of a common plan and scheme, and/or as "control persons" of the primary defendants engaged in the activities alleged herein constituting violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 and have forced Plaintiffs and the Class into securities transactions which caused their loss and damage and deprived Plaintiffs and the Class of the true value of their investment in the Archstone UPREIT and/or the entity formed as a result of the Merger.

43.    The Individual Defendants, and defendants Tishman Speyer and the Tishman-Speyer Trust, as officers, directors and/or trustees of the Archstone REIT and

the Archstone UPREIT, were controlling persons within the meaning of Section 15 of the Securities Act at the time of the wrongs alleged in this complaint.  As such, the Individual Defendants, Tishman Speyer and the Tishman-Speyer Trust had the power and authority to cause the Archstone REIT to engage in the acts described herein, and were also offerors to the extent described herein and/or solicitors of the exchange of shares offered pursuant to the Prospectus and Registration Statement.  The Individual Defendants owed to the A-1 Unit holders, including Plaintiffs, the duty to make a reasonable and diligent investigation of the statements contained in the offering materials related to the Merger, including the Prospectus and Registration Statement, to ensure that such statements were true and that there was no omission to state a material fact required to be stated to make the statements contained therein not misleading.

44.    The Individual Defendants, Tishman Speyer and the Tishman-Speyer Trust violated these duties and §§11, 12(a)(2) and 15 of the Securities Act when they signed, issued and disseminated, caused to be signed, issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Prospectus and Registration Statement, and documents incorporated therein, which misrepresented or failed to disclose, *inter alia*, the information set forth below.

45.    The Individual Defendants, as officers, directors and trustees of the Archstone REIT and the Archstone UPREIT, were controlling persons within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act at the time of the wrongs alleged in this complaint.  The Individual Defendants therefore

possessed the power and authority to cause Archstone REIT to engage in the acts described herein, and to control the content of the Prospectus and Registration Statement, as well as all relevant quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Archstone REIT's filings, reports and press releases alleged to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

### III.    JURISDICTION AND VENUE

46.    The claims asserted arise under §§10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and under §§11, 12(a)(2) and/or 15 of the Securities Act. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78(a) and §22(a) of the Securities Act, 15 U.S.C. §77v(a).

47.    Venue is proper pursuant to §27 of the Exchange Act, 15 U.S.C. §78(a) and §22(a) of the Securities Act, 15 U.S.C. §77v(a). Defendants have operations in this District, false statements were made in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District. Moreover, Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## IV.    SUBSTANTIVE ALLEGATIONS

**A. Prior To The Merger, Plaintiffs Owned Units In The Non-Public Archstone-Smith Operating Trust Which Was Structured As An UPREIT Managed By The Archstone Smith Trust, A Publicly Traded REIT.**

48.    The Archstone UPREIT, was structured as an Umbrella Partnership Real Estate Investment Trust.   All property ownership and business operations of the Archstone REIT were conducted through the Archstone UPREIT.

49.    The Archstone REIT was a Real Estate Investment Trust, with its common shares publicly traded on the New York Stock Exchange.  The Archstone REIT was the managing general partner of the Archstone UPREIT.  As the managing general partner, the REIT was responsible for the strategic direction of the UPREIT, as well as the management and administration of the properties held by the UPREIT.  Moreover, the Archstone REIT was the sole trustee and owned 88.2% of the Archstone UPREIT at December 31, 2006.

50.    As of December 31, 2006, the Archstone REIT and Archstone UPREIT (sometimes collectively referred to as the "Archstone Entities") owned or had an ownership position in 348 communities, representing 88,011 units, including units under construction.   The Archstone Entities were engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in the United States.

51.    The Archstone REIT and the UPREIT were the products of various mergers and acquisitions described below. In the late 1990's, realizing the tax benefits and liquidity advantages of an UPREIT, many real estate investors, including partnerships in which Plaintiffs and members of the Class were investors, agreed to contribute their properties to various UPREITS in exchange for equity interests.

52.    Oftentimes, the real estate contribution agreements and partnership agreements with the UPREITS in these transactions provided contributors with certain tax-protection, dividend and liquidity benefits.  For example, the A-1 Units held by Plaintiffs derive from units they held in real estate limited partnerships that owned and operated apartment buildings in the Chicago metropolitan area.  The real estate held by the limited partnerships was transferred pursuant to contribution agreements with Charles E. Smith Residential Realty L.P.  The contribution agreements provided that, for a period of time following the closings of the real estate contributions (which by the time of the Merger had not expired), the Smith UPREIT could not dispose of any interest in the property contributed by Plaintiffs (and other Class Members) that realized a taxable gain.  If such a gain was triggered, the Smith UPREIT was obligated to indemnify Plaintiffs for any resulting tax liability.

53.    The Plaintiffs' contribution agreements also provided that they could redeem their UPREIT units for cash or tradable common stock of the Charles E. Smith, Inc. REIT.

54.    On October 31, 2001, the Smith UPREIT merged with and into the Archstone UPREIT.  The foregoing tax protections and liquidity provisions were all contained in binding contribution agreements assumed by the Archstone UPREIT and Archstone REIT as well the Declaration of Trust governing the Archstone UPREIT and Archstone REIT.  A-1 Unit holders continued to be provided with the foregoing tax and liquidity protections.

55.    Upon information and belief, Plaintiffs' tax protections and liquidity provisions were common in most real estate contribution and partnership agreements with UPREITS, including those with the Archstone UPREIT.

56.    Specifically, the Archstone UPREIT agreed in its Declaration of Trust, for the benefit of the hundreds, if not thousands of A-1 Unit holders Class Members with tax and liquidity provisions virtually identical to those of the Plaintiffs, not to sell, exchange or otherwise dispose of, except in tax-free or tax-deferred transactions, any of the specifically enumerated properties that were held by a wholly owned subsidiary of the Archstone UPREIT.  According to the Declaration of Trust, these tax benefit restrictions were effective until as late as January 1, 2022.  In other words, the Archstone UPREIT agreed that it would not engage in any transactions that would subject A-1 Unit holders to tax liability. If it did, the governing documents required the UPREIT to indemnify the A-1  Unit holder for the tax liability.

57.    In addition to the tax protections explained above, each A-1 Unit issued pursuant to contribution agreements (with tax protections and liquidity provisions virtually identical to those contained in Plaintiffs' contribution agreements) was subject to a unit redemption right at the option of the A-1 Unit holder.  This redemption right required the Archstone UPREIT to acquire the unit holder's A-1 Unit for the market price of Archstone REIT common shares.  Once the redemption right was exercised, the Archstone REIT, in its discretion, could either assume and directly satisfy the Archstone UPREIT's redemption obligation, in which case the Archstone REIT would pay the redeeming unit holder in Archstone REIT common shares, or their cash equivalent.

## B. The Merger's Background

58.     On April 30, 2007, an unidentified company submitted a non-binding written indication of interest to acquire the Archstone Entities for a cash purchase price of $64.00 per Archstone REIT common share and $64.00 per Archstone UPREIT common unit.

59.     On May 2, 2007, the Tishman-Lehman Partnership submitted a written indication of interest to acquire the Archstone Entities for a cash purchase price of $64.00 per Archstone REIT common share and $64.00 per Archstone UPREIT common unit.

60.     On May 15 and 16, 2007, the Archstone REIT's board of trustees became aware of concerns on the part of both bidders with respect to the "significant magnitude of the built-in gain associated with certain of [Archstone's] properties that are subject to tax protection agreements with operating trust unit holders and the magnitude of the increase in property taxes as a result of the transaction."  Archstone Smith Operating Trust Form 424B3, filed Aug. 9, 2007, at 56.

61.     On May 19 and 20, 2007, the Tishman-Lehman Partnership indicated to Morgan Stanley, the Archstone Entities' financial advisor, that "due to increased expected transaction costs resulting from their better understanding of the magnitude of the company's tax protection obligations and due to adverse changes in the debt markets, they were uncertain whether any offer that they were to submit would be at a price equal to their initial indication of $64.00 per common share and unit."  *Id.* at 58.

62.     On May 23, 2007, the Tishman-Lehman Partnership contacted Morgan Stanley and offered to acquire the Archstone Entities at a price of $60.00 per Archstone REIT common share and $60.00 per Archstone UPREIT common unit.  This offer

represented a 6.25% decrease over a period of only three weeks. The Tishman-Lehman Partnership indicated that the decrease "was primarily a result of information obtained in their confirmatory due diligence regarding, among other things, the magnitude and scope of our tax protection arrangements, the compression in returns that they could expect to realize from our development pipeline, and the deterioration of the debt capital markets." *Id.* at 59. In addition, the Tishman-Lehman Partnership "indicated that they had determined that there were significant transaction costs exclusive of the impact on value associated with the Company's tax protection obligations." *Id.* In response, the Archstone REIT's board of trustees instructed Morgan Stanley to present a counterproposal of $62.00 per common share and common unit.

63.     On May 24, the Tishman-Lehman Partnership increased its offer to $61.00 per common share and common unit. Later that day, the Tishman-Lehman Partnership indicated that it was unwilling to pay $61.00 per common share and common unit unless the second quarter dividend was not paid. In response, Archstone REIT's board of trustees instructed Morgan Stanley to inform the Tishman-Lehman Partnership that the board would accept a price of $60.75 per common share and common unit and pay the second quarter dividend of $0.4525 per common share and common unit.

64.     By the close of business on May 29, 2007, the day the Merger was announced, the Archstone REIT's shares traded at $61.45, a premium to the Merger Agreement's consideration of $60.75 per share plus the anticipated dividend. Furthermore, the Archstone REIT's common stock price had traded well above the Merger Agreement's consideration as recently as January 30, 2007. In fact, the Archstone REIT's common shares had lost a considerable amount of their value

between late-January 2007 and May 25, 2007, the last business day before Defendants announced the Merger Agreement.

## C. The Merger Agreement

65.     On May 29, 2007, the Archstone REIT publicly announced that it signed a definitive merger agreement to be acquired by the Tishman-Lehman Partnership in a transaction valued at approximately $22.2 billion, including the assumption and refinancing of the Archstone REIT's outstanding debt and excluding transaction costs.

66.     Pursuant to the Merger Agreement, the Tishman-Lehman Partnership agreed to acquire all outstanding common shares of the Archstone REIT in exchange for $60.75 per share in cash.  The Archstone REIT reported that the purchase price per share represented a 22.7% premium over the share price on May 24, 2007, immediately before published reports regarding a potential acquisition.

67.     The Merger Agreement also provided that holders of A-1 Units were "entitled" to one newly issued Series O Unit for each existing A-1 Unit.  Alternatively, A-1 Unit holders could "elect" to receive: (a) $60.75 per A-1 Unit in cash, without interest and less applicable withholding taxes; or (b) a combination of the cash consideration and Series O Units. However, the Merger Agreement purported to eliminate the tax benefit obligation of the UPREIT

68.     Moreover, pursuant to the Merger Agreement no additional quarterly dividend distributions would be paid to A-1 Unit holders prior to the completion of Merger.

69.    A-1 Unit holders were allowed until 11:59 P.M., EST, on September 10, 2007, to make an "election" for their common units, which deadline was later extended until September 18, 2007.

**D. The A-1 Unit Holders' Tax Benefits Were Eliminated In The Merger Because Defendants Recognized It Would Have Been Too Expensive To Honor The Tax Benefits As An Integral Part Of The Archstone Entities' Economic Structure.**

70.    While the Tishman Speyer justified the reduction of their offer form $64.00 per unit to $60.75 per unit by pointing to the potential tax liability to A-1 Unit holders, the parties agreed to engage in the series of transactions that would result in the elimination of the tax benefits and other valuable economic features of the original A-1 Units through the Merger and improper changes to the existing Declaration of Trust.

71.    Both the unidentified company and the Tishman-Lehman Partnership explained on numerous occasions that their offer prices to acquire the Archstone entities were based upon, among other things, the magnitude and scope of the Archstone UPREIT's tax protection arrangements with A-1 Unit holders. All potential acquirers came to the same conclusion: that the UPREIT's tax protection, liquidity, dividend and other obligations were contractual obligations that would survive the Merger and therefore the potential acquirers needed to factor that liability into the acquisition price. In fact, the tax protections afforded to the A-1 Unit holders ultimately led to the unidentified company's decision not to submit an offer to acquire the Archstone Entities.

72.    Accordingly, the potential liability to the acquirers of the tax protection obligations caused them to lower the price to be offered, which in turn lowered the price at which A-1 Unit holders could "elect" to cash out at the time of the Merger. In effect,

the acquirers were getting the benefit of off-setting the potential tax liability while, at the same time, A-1 Unit holders such as Plaintiffs were having those very tax protections taken away.

73.     The Merger thereby caused a loss of value for both A-1 Unit holders that "elected" to receive the Tishman-Lehman Partnership's cash offer and A-1 Unit holders that "elected" to convert or otherwise had their A-1 Units converted to Series O Units.

74.     The removal of the liquidity and dividend guarantees from the original A-1 Units, as well as the cancellation of their tax-protections, represented a complete and fundamental change in the nature and material economic characteristics of the A-1 Units.  The A-1 Units may have had the same name, but this fundamental change effectively eliminated the original A-1 Units or turned them into a completely different security and, as a result, each A-1 Unit holder acquired a separate and distinct new A-1 Unit that that they were forced to convert into cash and/or a Series O Unit that is traceable directly back to the Registration Statement.

75.     In short, the holders of A-1 Units became holders of newly-issued A-1 Units which forced them to convert the new A-1 Units to Series O Units or accept the Tishman-Lehman Partnership's cash offer and recognize capital gain in an amount equal to the amount of gain Defendants had agreed would be deferred when Plaintiffs and other Class members originally contributed their properties to the Archstone UPREIT, and for which they would have been indemnified but for the fundamental change in the A-1 Units.  Upon information and belief, such gains have resulted in millions of dollars of tax liability for many A-1 Unit holders.

76. At the same time, the holders of the new A-1 Units that converted to Series O Units were forced to forfeit the liquidity to which they were entitled before the Merger and are now saddled with owning an investment in a private company that is highly leveraged with debt and is worth a fraction of what it was represented to be worth in the Prospectus and Registration Statement.

77. For example, the Merger Agreement provides that after five years Series O Unit holders can, under certain circumstances, redeem any or all their units at a cash redemption of $60.75 per unit plus all accumulated and unpaid distributions, if any, through the redemption date. Hence, the Series O Units are completely illiquid for a minimum of five years.

78. Moreover, even after the expiration of the five-year redemption waiting period described above, Series O Unit holders may only gradually liquidate their investment; no more than one-third of the Series O Units outstanding can be redeemed in any twelve month period. If redemption notices for a number of Series O Units exceed that limit, units will be redeemed in the order received rather than pro rata.

79. Thus, Series O Unit holders will be forced to hold an almost completely illiquid asset of undeterminable value, for a minimum of five years since these units are not publicly traded in the market, and even after this five year period, the liquidity of these units will be severely limited and possibly eliminated altogether. The Archstone UPREIT, however, has the right but not the obligation to redeem all of the Series O Units for cash at $60.75 per unit any time after the fifth anniversary of the Merger.

**E. The Merger Eliminated Substantive Economic Features And Changed Material Provisions Of The A-1 Units And Thus Imposed A "Fundamental Change" On The A-1 Units.**

80.     The Registration Statement Prospectus admitted that the transaction worked a fundamental change upon the A-1 Units by disclosing that the A-1 Unit holders would suffer substantial impairment of their rights if they elected to exchange their A-1 Units for Series O Units.  In the section titled "Risk Factors," the Prospectus provided that the A-1 Unit holders who elect to receive Series O Preferred Units would be "subject to the terms of a new declaration of trust... which are *materially different from, and may be less favorable than,* the rights they have as holders of the Class A-1 common units under [Archstone's] existing declaration of trust."  The Prospectus also contained a section titled "Comparison of Rights of Class A-1 Common Unit holders And Series O Preferred Unit holders" which summarized the fundamental differences between certain provisions of Archstone's Declaration of Trust as of May 19, 2006 (the "2006 Declaration of Trust"), and the new Declaration of Trust that would become effective as a result of the Merger, insofar as they affect the A-1 Unit holders, related to *inter alia* capitalization, issuance of additional units, distributions, redemption rights, outside activities of the trustees of the new company, tax protection, transfers of units, voting rights and indemnification.

81.     As described below, the fundamental adverse changes that the Merger imposed upon the A-1 Units owned by Plaintiffs and Class Members include, but are not limited to, the following:

a. Before the Merger, A-1 Units were protected by anti-dilution measures in the Archstone UPREIT's governing documents.  After the Merger, these anti-dilution measures were eliminated.

b. Before the Merger, A-1 Unit holders were entitled to their pro rata share of the proceeds of dissolution, liquidation, or winding up remaining after payment of the Archstone UPREIT's debts and satisfaction of the preferences of any class or series of units entitled to a preference in dissolution, liquidation, or winding up over the Archstone UPREIT's common units.  After the Merger, Series O Unit holders are only entitled to $60.75 per share plus any unpaid distributions.

c. Before the Merger, the Archstone UPREIT was managed by the Archstone REIT, and the Archstone REIT could not take any action that was contrary to an express limitation or prohibition in the 2006 Declaration of Trust without an amendment to that provision adopted under the 2006 Declaration of Trust. As part of the Merger, Defendants eliminated the protection of allowing limited or prohibited action only after amendment of the 2006 Declaration of Trust.

d. Before the Merger, the Archstone REIT was generally prohibited from, directly or indirectly, entering into or conducting any business other than in connection with the ownership, acquisition and disposition of its and the management of its business activities.  After the Merger the REIT can engage in business activities in addition to those relating to the newly formed UPREIT, including business interests and activities that are in direct competition with newly formed UPREIT.

e. Before the Merger, A-1 Unit holders received quarterly and annual financial reports.  After the Merger, Series O Unit holders will receive only annual financial reports.

82.    Hence, the Merger eliminated substantive economic features and changed material provisions of the A-1 units and thus imposed a "fundamental change" on the original A-1 Units.  Plaintiffs and members of the Class therefore sustained, and will continue to sustain, significant damages as a result.

**F.  Defendants' Materially False And Misleading Registration Statement And Prospectus Forced Conversion Of Plaintiffs and Class Members' A-1 Units Into Cash Or Series O Units At A Loss to Plaintiffs And The Class.**

83.    The Archstone REIT filed its Prospectus and Registration Statement containing the terms of the Merger in mid-July 2007 and subsequently amended them in September.  The Prospectus was addressed to A-1 Unit holders and signed by R. Scot Sellers, Chief Executive Officer of Archstone-Smith Operating Trust.  The Prospectus provided a summary of the Merger and its parties, and a description of the Series O Preferred Units and of the process by which the A-1 Unit holders could elect to exchange their A-1 Units for O Units or cash consideration.

84.    The Prospectus incorporated by reference the following documents containing important information about Archstone and Archstone Smith Operating Trust and their financial condition and operating results:

a.    Annual Report on Form 10-K for the year ended December 31, 2006, filed with the SEC on March 1, 2007;

b.    Quarterly Report on Form 10-Q for the quarter ended March 31, 2007, filed with the SEC on May 9, 2007; and

c.    Current Reports on Form 8-K filed with the SEC on January 5, 2007, May 29, 2007, May 30, 2007, June 1, 2007, June 12, 2007, June 28, 2007 and August 6, 2007.

85.    The Archstone REIT and the Archstone UPREIT also incorporated by reference any documents filed by them pursuant to §§13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of the Prospectus and prior to the date of the election deadline.  The Prospectus provided that the information contained in any of these documents would be considered part of the Prospectus from the date these documents would be filed.

86.    Such false and misleading statements contained in the Prospectus and the subsequent Registration Statement and its supplements include, but are not limited to, the following:

a.  They failed to make full and adequate disclosure of factors and assumptions underlying the selection and exclusion of comparable companies associated with the comparable company and comparable transaction analysis performed by Morgan Stanley & Co., Inc.   Morgan Stanley served as Archstone-Smith's financial adviser during the merger.  Although the proxy supplement reveals "numerous assumptions with respect to industry performance, general business and economic conditions and other matters" were made, none of those assumptions was disclosed, nor was there any description of the "other matters" considered.  As a result, Plaintiffs and the Class were denied facts necessary to understanding how the Archstone Entities were valued relative to those companies deemed "comparable," as well as how Defendants  determined what was "precedent" to the subject transaction.   These factors were necessary in order to make the other

statements contained in the Prospectus and Registration Statement not misleading.

b.  In addition, they failed to disclose what the results of the Morgan Stanley analysis would have been had the tax protection benefits to A-1 Unit holders been factored into the analysis.  This analysis was necessary in order to provide Plaintiffs and members of the Class with information to make a full and informed decision regarding their "election".  The Prospectus and Registration Statement also failed to disclose differences in the quality and performance of the properties owned by the Archstone Entities versus those owned by the comparable public companies, the disclosure of which was necessary to provide A-1 Unit holders with a clear understanding of the relative value of the Archstone Entities' properties, and to make the other statements contained in the Prospectus and Registration Statement not misleading.

c.  The Prospectus and Registration Statement and supplements failed to consider any projections any more recent than those extant in "late 2006" and failed to disclose the reliability of those old projections by disclosing whether and to what extent there had been any deviation in the actual operating results from those projections.  These projections were necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

d.  The Prospectus and Registration Statement failed to disclose Archstone management's conclusions regarding the prospects for exceeding the

financial projections.  Given the character of the Archstone Entities' properties (generally regarded as very high), as well as the value of its development pipeline (estimated by Wall Street analysts at over $4 billion), the Archstone Entities are positioned for strong growth in revenue and profits over the next several years as the market recovers .  A-1 Unit holders were also deprived of financial information material to their "election" because the defendants concealed and refused to disclose the projections for dividends to A-1 Unit holders in the future.  As a result of this growth, understanding the REIT's future financial prospects was material to Plaintiffs' and Class Members' ability to quantify the REIT's value in order to make a full and informed decision of their "election."  As such, these conclusions and financial information were necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

e.  In regards to the dividend discount model analysis, the Prospectus and Registration Statement failed to disclose all the methodologies used to select the range of discount rates disclosed in the Prospectus and Registration Statements and the supplements.  Defendants also concealed from the A-1 Unit holders information within their possession which was used in the analysis to arrive at the fairness opinion information concerning "observed private market discount rates."  These methodologies and information were necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

f.  With respect to the adjusted net asset value analysis, the Prospectus and Registration Statement provided no disclosure of the asset by asset valuations conducted by Archstone in March to May 2006 and March to May 2007 or the changes, if any, in the assets valuations individually or in the aggregate used in the analysis.  The Prospectus and Registration Statement provided no information regarding the indicated aggregate or property-specific values resulting from this analysis.  These valuations and information were necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

g.  The Prospectus and Registration Statement revealed that numerous transaction costs were seemingly deducted from its net asset value analysis, which in turn, lowered the overall value of the Archstone Entities.  The rationale for this decision was not disclosed, however.  The disclosure of this rationale was necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

h.  The Prospectus and Registration Statement failed to properly disclose the analysis of the Archstone Entities' development portfolio.  The Prospectus and Registration Statement simply stated that this portfolio was valued by discounting a "spread" between the projects' future values and estimated costs.  However, given the size of the potential portfolio (one analyst estimated it at $4.4 billion), more thorough disclosure of this analysis was necessary to understanding the Archstone Entities' value, and to make the

other statements contained in the Prospectus and Registration Statement not misleading.

i.   The Prospectus and Registration Statement stated that Morgan Stanley had provided financial advisory and financing services for both members of the Tishman-Lehman Partnership.  The extent and nature of these relationships was not disclosed, however, along with any fees Morgan Stanley had earned from these relationships in the past five years.  Moreover, neither the Trustees nor Morgan Stanley explained how Morgan Stanley was able to neutralize Morgan Stanley's financial motive to find the offered transaction "fair" given that Morgan Stanley's contract with Archstone would pay Morgan Stanley only $1 million dollars for the fairness opinion work if the transaction was not consummated but Morgan Stanley would earn $24 million for the same fairness opinion work if the transaction was consummated.  Absent disclosure, Plaintiffs and the Class could not properly evaluate Morgan Stanley's independence and its ability to objectively discharge its duties to the Archstone Entities.  This disclosure was necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

j.   The Prospectus and Registration Statement failed to disclose the quantification of the "tax protection agreements with operating trust unit holders" which resulted in a "range of present value tax protection costs of $93 million to $278 million" that purportedly negatively impacted both the unidentified company's and the Tishman-Lehman Partnership's valuation of

the Archstone Entities' shares.  Given the exceedingly broad range of the estimate and the failure to provide all the underlying assumptions, Plaintiffs and the Class were unable to value or analyze the magnitude and effect of such tax protection agreements.  The Prospectus and Registration Statement and supplements thereto also disclosed that taking into account tax protection costs and other transactions cost yielded an implied valuation for the common shares of $53.06 to $59.34 per share but failed to disclose the implied value of A-1 Units with and without the burden and benefit of the tax protections. This information was necessary to make the other statements contained in the Prospectus and Registration Statement not misleading.

k.  The Prospectus and registration Statements also failed to disclose material information concerning the values and valuations of future development properties, including the assumptions underlying its selection of discount rates as high as 16% to 20% which had a material adverse effect on the valuations.   Such information is particularly material given that the addition of estimated platform values drove the implied per share valuation as high as $64.45 per share, and was necessary to make the other statements contained in the Prospectus and Registration Statement not misleading.

l.  The Prospectus and Registration Statement stated that the Archstone Entities' board of trustees, after careful consideration, unanimously approved the Merger and the other transactions contemplated by the Merger Agreement, and had declared the Merger and the other transactions contemplated by the Merger Agreement advisable, fair to and in the

Archstone Entities' best interests and the best interests of A-1 Unit holders and Archstone REIT's common shareholders. However, the Prospectus and Registration Statement failed to disclose any information concerning the UPREIT trustees' view of the Merger from the point of view of fairness to the A-1 Unit holders. It also failed to disclose why Defendants had failed to obtain any fairness opinion, appraisal, or other determination by a financial adviser or other neutral third party regarding the fairness of the consideration offered to the A-1 Unit holders. This information was necessary to make the other statements contained in the Prospectus and Registration Statement not misleading to the A-1 Unit holders.

**G. The Registration Statement And Prospectus Failed To Adequately Disclose All Risks Associated With Archstone's Operations, Indebtedness And Financing**

87.     In a section titled Risk Factors, the Prospectus disclosed various risks related to the Series O Units and Archstone's structure after the mergers, risks related to Archstone's financing and indebtedness, and risks related to the mergers, risks related to Archstone's business and real estate investments, and tax risks. The materially misleading nature of these Risk Factors was only later revealed in March 2008, when Archstone issued its final Annual Report on Form 10-k for the period ended December 31, 2008 and disclosed for the first time greater and graver risks that threatened Archstone's operations, financial conditions and viability. The Risk Factor section omitted, among others, the following:

a. That Archstone could incur increased costs that could be triggered by a taxable sale of certain properties contributed to Archstone as a result of tax-

related obligations to the contributors of these properties, and that these restrictions could make it cost-prohibitive for Archstone to sell one or more of these properties even though such sale may be in the Unit holders' best interests.

b.  That Archstone had a limited operating history under its new ownership and that the Lehman Brothers-Tishman Speyer venture was not involved in Archstone's operation or performance of its business.  Therefore, Archstone should have disclosed that it could not guarantee the changes associated with the Merger would yield favorable results or that Archstone would realize the benefits anticipated in connection with the Merger, and that Archstone could not be sure how it would be operated or would perform financially. Archstone also failed to disclose that this new ownership had retained flexibility to change Archstone's investment strategy for any reason, and that such strategy changes could adversely affect Archstone's financial condition and results of operations and ability to pay distributions to Unit holders.

c.  That the U.S. residential mortgage market was experiencing difficulties and changed economic conditions that could more adversely affect the credit markets than was apparent, including the commercial lending market, and that continued volatility in the debt market could make it more difficult or costly for Archstone to borrow money to finance its business.  Archstone failed to disclose that it relied on national and regional institutions including Fannie Mae and Freddie Mac to provide financing for its acquisitions and development projects, and that these institutions may have suffered financial

difficulties as a result of changing market conditions and could t become insolvent or tightening their lending standards, all of which could make it more difficult for Archstone to obtain financing, which could adversely affect Archstone's financial condition and results of operations.

d. That Archstone had significant debt levels which could limit Archstone's flexibility in planning for, or reacting to, changes in its business or its industry in general. Archstone failed to disclose that this substantial amount of debt and the amount needed to service Archstone's debt obligations could adversely affect its ability to obtain additional financing in the future on favorable terms or at all for working capital, capital expenditures, acquisitions, development or other general corporate purposes, and that this high degree of leverage made Archstone more vulnerable to a downturn in business or the economy in general, and could place Archstone at a disadvantage compared to competitors less-highly leveraged. Archstone failed to disclose the risk that it would not have sufficient cash flow from operations or capital transactions to service its indebtedness and would be unable to incur additional indebtedness without violating various financial ratios contained in its debt agreements, and that if it could not meet required payments under its debt agreements or could not comply with the covenants contained in those agreements, the lenders would declare Archstone in default and would seek available remedies under the agreements, which could include transferring properties to the lender under indebtedness secured by real property.

e.  That Archstone's debt agreements contain covenants which restrict its ability to incur additional indebtedness and restrict its ability to engage in material asset sales, mergers, consolidations and acquisitions, and to make capital expenditures and also require Archstone to maintain various financial ratios. Archstone also failed to disclose that its Master Credit Facility required the establishment of a funded interest reserve of $500 million to facilitate compliance with debt service coverage ratios under the facility, and that it expected that it would need to draw on those reserves in 2008 to maintain compliance with these ratios.  Archstone also failed to disclose that some loans under its major credit facilities are cross-collateralized and contain cross default provisions with other material loans, and therefore that a failure or default with respect to certain properties could have an adverse impact on Archstone or its properties that are subject to the cross-collateralization under the applicable debt instrument.  Archstone also failed to disclose that a failure to comply with these covenants could cause a default under the agreements and result in a requirement to repay the indebtedness prior to maturity, which could have an adverse effect on Archstone's cash flow and ability to make distributions to Unit holders.

f.  That Archstone mortgages payable unsecured credit facility and unsecured revolving line of credit  would be affected  by increases in interest rate that would increase ASN's interest expense under these instruments and would increase the cost of refinancing these instruments and issuing new debt.  As

a result, higher interest rates would adversely affect cash flow and ASN's ability to service its indebtedness and to make distributions to Unit holders.

g.  That possible increases in interest and other costs in connection with the syndication of some of Archstone's debt could adversely affect its results of operation, its ability to satisfy its debt obligations and ability to pay distributions to Unit holders.  Archstone failed to disclose that a significant portion of Archstone's debt is subject to increases in interest and borrowing costs and payment of fees to lenders in connection with the potential syndication of such debt – including the lenders under Archstone's Master Credit Facility and mezzanine loans provided by the Fannie Mae Mezzanine Lenders and the Freddie Mac Mezzanine Lenders, which have the option to syndicate or sell the outstanding principal amount under such agreements to other investors at a discount and may revise the interest rate spread or discount or increase fees to a level necessary to facilitate syndication based on current market conditions at the syndication date.  As of December 31, 2007, $5.6 billion in outstanding principal indebtedness under these loans was subject to syndication and the increased borrowing costs described above.  Archstone failed to disclose that the cost associated with any incremental interest or additional fees, as well as any original issue discount realized, is required to be born by Archstone.  Archstone also failed to disclose that the deterioration of the residential mortgage market could cause a widening of the credit spreads on both commercial mortgage-backed securities and commercial real estate collateralized debt obligations, and that

the lenders could be required to increase the pricing or fees if these conditions continued or worsened, and that such increases in interest and payments would adversely affect Archstone's cash flow, ability to satisfy its debt obligations and its ability to make distributions to Unit holders.

h. That a reduction in the value of Archstone's assets or an increase in indebtedness could trigger an increased distribution rate and a redemption right of Series O Unit holders, which could adversely affect Archstone's cash flows.  Archstone failed to disclose that if it were required to pay this higher distribution or to redeem a material portion of the outstanding Series O Units, its cash flows and ability to satisfy its debt obligations would be materially adversely affected.

i. That a default by Archstone's affiliated entities on intercompany loans could adversely affect Archstone's cash flows, its ability to satisfy its debt obligations and ability to make distributions to Unit holders.  Archstone failed to disclose that it had intercompany transactions with affiliated entities and recorded a receivable from affiliated entities when they borrowed from Archstone or when Archstone paid billings on their behalf, but that Archstone charges interest on balances owed to it by affiliates under the intercompany loans at the same rate that they are paying and therefore do not recognize any profit from their affiliated entities.  As of June 30, 2007, there was an aggregate of $99.9 million outstanding to Archstone UPREIT under all such transactions.  Archstone failed to disclose that a default by one or more of the affiliated entities on payments to Archstone under its intercompany balances

would adversely affect Archstone's ability to satisfy its debt obligations and ability to make distributions to Unit holders, and that, because of the way the Lehman-Tishman venture's credit facilities and intracompany loans are structured, a failure or default with respect to one or more affiliate entities' properties could have an adverse impact on Archstone or its other properties.

88.    The disclosures made by Archstone in the Risk Factors section of its Prospectus were materially false and misleading because they omitted to disclose these other risks associated with Archstone's operations, indebtedness and financing which were known by Defendants at the time.  Instead, although known to them at the time of the Merger, Defendants withheld such disclosures until Archstone's 10-K report for the fiscal year ended December 31, 2007.

## H. The Prospectus And Registration Statement  Misrepresented The Voting Rights Of Unit Holders And Their Risk Of Tax Liability

89.    The Prospectus stated that "[a]s a holder of approximately 89.3% of all of our outstanding common units, Archstone-Smith Trust's approval is the only approval of the holders of our common units that is necessary under the merger agreement to approve the mergers and the other transactions contemplated by the merger agreement, as amended.  Archstone-Smith Trust intends to approve the mergers, which approval is expected to be effective 20 days after the date of this prospectus/information statement.  As a result, you are not being asked to vote on either of the mergers, we are not asking you for a proxy and you are requested not to send a proxy pursuant to this prospectus/information statement.  You only have the right to make an election with respect to the form of consideration that you will receive in connection with our merger."

90.     This statement was false because the Archstone-Smith Operating Trust Articles of Restatement dated May 19, 2006 provided that the Trust Agreement "shall not be amended with respect to any Unit holder adversely affected thereby without the approval of such Unit holder, if such amendment would [*inter alia*]... amend Article 3 [related to Unit holders' rights and obligations] or 4 [related to Trustees]...."  The proposed Merger, with its amendments to the Trust Agreement dated October 3, 2007 (the "October 2007 Amended Trust Agreement"), did materially and adversely affect the rights of Archstone's A-1 Unit holders; therefore, *approval by vote of each A-1 Unit holder adversely affecte*d by the Merger was *required* for any amendment of the Declaration of Trust as a transaction related to the Merger.

91.     In a section titled "Tax Risks," the Prospectus provided that "[t]he operating trust intends that you should not recognize any gain or loss if you receive only Series O Preferred Units in the operating trust in exchange for your Class A-1 common units... [however] there is a risk that the IRS could assert that holders of Series O Preferred Units should be treated as creditors of the operating trust... [and] that gain or loss would be recognized over time under rules applicable to payments made in liquidation of the interest of a retiring partner."

92.     This statement was false because the terms of the October 2007 Amended Trust Agreement materially changed provisions that had protected the A-1 Unit holders from tax liability in the event that a variety of transactions would occur. Thus, this statement fundamentally understated the likelihood of tax liability that the A-1 Unit holders would incur if they converted to Series O Units.

93.     The Tax Risks section of the Prospectus also provided that "[t]he operating trust intends that you should not recognize any gain or loss if you receive only Series O Preferred Units in the operating trust in exchange for your Class A-1 common units."  This section further provided that "existing tax protection agreements with certain Class A-1 common Unit holders will remain in effect to the extent not waived in connection with the unit holder's election to receive some cash consideration in the operating trust merger.  No assurance can be given, however, that the operating trust will have sufficient cash or availability of borrowings to satisfy payment obligations that arise under such agreements in the future."

94.     This statement was false because the terms of the October 2007 Amended Trust Agreement materially changed provisions that had protected the A-1 Unit holders from tax liability in the event that a variety of transactions would occur. Thus, this statement misrepresented that the former tax protection agreements would remain in effect, when in reality there was a high likelihood that the A-1 Unit holders would incur tax liability if they converted to Series O Units.

95.     The Tax Risks section of the Prospectus also provided that "[i]f you receive Series O Preferred Units in consideration for your Class A-1 common units, you will be allocated your proportionate share of the operating trust's gain attributable to any assets sold by the operating trust after the date of the operating trust merger... *To the extent, however, that gain is recognized with respect to properties that are covered by existing tax protection agreements with certain Class A-1 common Unit holders, you will be entitled to indemnification as and to the extent provided in such agreements.*"

96.    This statement was false because the terms of the October 2007 Amended Trust Agreement materially changed provisions that had protected the A-1 Unit holders from tax liability in the event that a variety of transactions would occur. Thus, this statement misrepresented that the former tax protection and indemnification agreements would remain in effect, when in reality they would be amended and effectively cease to protect the A-1 Unit holders from tax liability if they converted to Series O Units.

97.    The Defendants' dissemination of a materially false and misleading Prospectus and Registration Statement  were necessary for the transactions constituting the forced  sale / purchase of the A-1 Units to succeed and  allowed defendants to force a fundamental change on the A-1 unit holders  and also precluded A-1 Unit holders from determining the true value of their A-1 Units, as well as the true value of the Archstone Entities as a whole, and prevented the A-1 Unit holders from making fully informed decisions as to the "election" and disposition of their A-1 Units.

98.    Likewise, the Defendants' dissemination of a materially false and misleading Prospectus and Registration Statement precluded A-1 Unit holders from determining the true value of their options, as Defendants' misrepresentations and omissions led to the conclusion that the potential conversion to Series O Units was more valuable than it actually was.

## V.    POST-MERGER REVELATIONS

99.    In addition to the admissions of material risks disclosed for the first time in the 2007 10-K, issued in March 2008, after the forced election, new information was revealed which demonstrated the materially false and misleading nature of the

prospectus and registration statement used to effect the forced sale/purchases described herein.

100.    Shortly after, and as a result of, the Merger, a January 21, 2008 article in *Barron's* reported that the Archstone UPREIT's debt exceeded $16 billion with annual interest payments alone that exceeded $1 billion.  In contrast, cash flow was running at a rate of $700 million annually.  In short, the Archstone UPREIT was cash flow negative just months after the Merger, and the real estate market has since substantially declined and continues to do so.

101.    Further, because the Merger was highly leveraged, having annual interest payments that exceed annual cash flow, it is highly doubtful that any former A-1 Unit holder will be able to redeem their Series O Units in five years.  The same January 21 *Barron's* article also estimated that, given the $16 billion in debt, insufficient cash flow to pay the interest on that debt, and declining real estate market, the Archstone UPREIT had *no equity value*.

102.    An August 13, 2008 article in the *New York Times* reported that even though rents in Archstone buildings had risen by five percent, the portfolio still lost value, and that while apartment REIT shares have risen recently, total returns had declined by 8.56 percent since the Archstone deal was announced.  More importantly, according to the article, Lehman Brothers and Tishman Speyer had recently conceded they would take an astonishing 25 percent write-down on the investment and that, as a private concern, "Archstone has been scrambling to shed some of its portfolio to pay down its debt.  The company has sold $2.3 billion in assets since the buyout, and has

as much as $2 billion worth of properties on the market, said Robert M. White Jr., the

president of Real Capital Analytics, a New York research company."

103.    This bleak outlook was further confirmed when, on October 1, 2008,

Defendants notified the Series O Unit holders that the Debt-to-Asset ratio exceeded

0.85, *and that the Archstone REIT expected that it would continue to do so*.  Thus, the

REIT has no current plan to pay dividends and does not know when it will begin, if ever,

paying them.  Plaintiffs and members of the Class will likely now be forced to pay taxes

on "phantom income" allocated to them, but for which there are no cash distributions

with which to pay the taxes.

## VI.    DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS CAUSED PLAINTIFF'S DAMAGES

104.    Defendants' materially false and misleading statements and omissions

issued in connection with the transactions referred to herein caused the damages

suffered by Plaintiffs and the Class.  Plaintiffs and the Class were damaged by the

forced conversion of the A-1 Units for $60.75 in cash or the economically inferior Series

O Units.    The $60.75 per unit cash-out price and the Series O Units were worth

materially less than the original A-1 Units they replaced.

## VII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: MATERIAL OMISSIONS, THE HUDDELSTON DOCTRINE  AND THE FRAUD-ON-THE-MARKET DOCTRINE

105.    Pursuant to their claims under Section 10(b) of the Exchange Act and

Rule 10b-5 thereunder, Plaintiff will rely, in part, upon the presumption of reliance

established by the fraud-on-the-market doctrine such that:

a.    Defendants made public misrepresentations or failed to disclose material

facts during the Class Period;

b.  The omissions and misrepresentations were material;

c.  The A-1 Units were exchangeable for common stock in the Archstone REIT on a one-for-one basis, and such common stock was traded in an open and efficient market;

d.  The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Archstone REIT's securities; and

e.  Plaintiff and the other members of the Class exchanged their A-1 Units for Series O Units or cash without knowledge of the omitted or misrepresented facts.

f.  At all relevant times, the market for Archstone's common stock was an efficient market for the following reasons, among others:

g.  The Archstone REIT's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

h.  As a regulated issuer, the Archstone REIT filed periodic public reports with the SEC and the NYSE;

i.  The Archstone REIT regularly communicated with public investors through established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and similar reporting services; and

j.   The Archstone REIT was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

106.   As a result of the foregoing, the market for the Archstone REIT's common stock promptly digested current information regarding the Archstone REIT from all publicly available sources and reflected such information in the Archstone REIT's common stock price and, by direct association, the price of the A-1 Units.   Under these circumstances, all Class Members that exchanged A-1 Units for Series O Units pursuant to the Merger suffered similar injury through their purchase of the Series O Units and/or cash-out for $60.75 cash and a presumption of reliance applies.

## VIII.       CLASS ACTION ALLEGATIONS

107.   Plaintiffs Katz, Stender and Infinity bring this action on behalf of themselves and a nationwide class of all others similarly situated pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all holders of Class A-1, OP or similar Common Unit of Archstone-Smith Operating Trust at the time of the Merger.   The Class includes two subclasses:

a.   All A-1 Unit holders at the time of the Merger, for statutory damages and rescissory damages arising from the Merger and exchange of A-1 Units for cash pursuant to an agreement among the Archstone UPREIT, the Archstone REIT, and the Tishman-Lehman Partnership to take the publically held Archstone REIT private (the "Cash-Out Subclass").

b. All A-1 Unit holders at the time of the Merger, for statutory damages and rescissory damages arising from the Merger and exchange of A-1 Units for new Series O Units pursuant to the Merger (the "Series O Subclass").

108.    Plaintiffs Katz and Stender seek to represent the Cash-Out Subclass. Plaintiff Infinity seeks to represent the Series O Subclass.

109.    Subject to additional information obtained through further investigation and discovery, the Class definitions may be expanded or narrowed by amendment or amended complaint.  Specifically excluded from both the Cash-Out Subclass and the Series O Subclass are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

110.    **Numerosity.**  Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains hundreds, if not thousands of similarly situated A-1 Unit holders and Series O Unit holders of record scattered throughout the United States. Upon information and belief, hundreds, if not thousands of other A-1 Unit holders enjoyed similar, if not identical liquidity and tax benefits through their agreements with the Archstone UPREIT.  The precise number of Class Members is unknown to Plaintiffs. The true number of members of each Class is known by Defendants, however, and thus, may be notified of the pendency of this action by first class mail, electronic mail, and by published notice.

111. **Existence and Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all members of each Class and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are not limited to, the following:

a. Whether the Defendants violated the federal securities laws as alleged herein;

b. Whether the Registration Statement and Prospectus contained material misstatements or omissions; and

c. Whether Plaintiffs and members of the Class have sustained damages as a result of Defendants' conduct, and, if so, the appropriate measure of damages.

112. **Typicality.** Plaintiffs' claims are typical of the claims of the members of each Class. Katz and Stender and members of the Cash-Out Subclass were A-1 Unit holders of the Archstone UPREIT who have and will continue to suffer financial hardship and other damages as a result of Defendants' conduct. Infinity and members of the Series O Subclass were A-1 Unit holders of the Archstone UPREIT who exchanged their A-1 Units for Series O Units and have and will continue to suffer financial hardship and other damages as a result of Defendants' conduct.

113. **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of the members of each subclass. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of either subclass.

114. **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual members of each subclass is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against the Defendants.  It would thus be virtually impossible for the members of each subclass, on an individual basis, to obtain effective redress for the wrongs done to them.

115. Furthermore, even if members of each subclass could afford such individualized litigation, the court system could not.  Individualized claims brought by members of either Class would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

## IX.     NO STATUTORY SAFE HARBOR

116. The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to any of the false statements pleaded herein because none of those statements are "forward-looking" statements nor were they identified as "forward-looking statements" when made.  Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ

materially from those in any purportedly forward-looking statements accompany those statements.

117.     In the alternative, to the extent that the Defendants successfully argue that the statutory safe harbor does apply to any statements pleaded herein which are deemed to be forward-looking, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew that those forward-looking statements were false and/or the statements were authorized and/or approved by an executive officer who actually knew that the statements were false when made.

## COUNT I

### VIOLATION OF SECTION 11 OF THE SECURITIES ACT
### (Against the Archstone UPREIT and the Individual Defendants)

118.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

119.     Plaintiff Infinity Clark Street Operating brings this count pursuant to Section 11 of the Securities Act on behalf of the Series O Subclass, persons or entities who exchanged their new A-1 Units for Series O Units pursuant and traceable to the Registration Statement and Prospectus signed by the Individual Defendants.  At the time Infinity and members of the Series O Subclass acquired the new A-1 Units and exchanged them for Series O Units, they were without knowledge of the facts concerning the materially false and misleading statements in the Registration Statement and Prospectus.

120.     Plaintiff Katz and Stender bring this count pursuant to Section 11 of the Securities Act on behalf of the Cash-Out Subclass, persons or entities who acquired

new A-1 Units issued pursuant to a Registration Statement signed by the Individual Defendants.  At the time Katz, Stender and members of the Cash-Out Subclass acquired the new A-1 Units and cashed out of those Units, they were without knowledge of the facts concerning the materially false and misleading statements in the Registration Statement and Prospectus.

121.    The Registration Statement and Prospectus, as set forth above, were false and misleading, contained untrue statements of material facts, and omitted to state other facts necessary to make the statements contained therein not misleading.  In particular, as set forth above, the Registration Statement and Prospectus were false and misleading in that they failed to make a full and adequate disclosure of factors, assumptions, findings and determinations materially related to the Merger, thereby preventing the original A-1 Unit holders from making fully informed decisions as to the "election" and disposition of their original A-1 Units.

122.    All Defendants are responsible for the contents and dissemination of the Registration Statement and Prospectus, and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true and without omissions of any material facts and were not misleading.

123.    The Individual Defendants, as signatories of the Registration Statement and the Prospectus and as directors and/or officers of Archstone UPREIT, are strictly liable for the misstatements and omissions in the Registration Statement and Prospectus pursuant to which the new A-1 Units and Series O Units were issued, and

for the damages that Plaintiffs and other members of each subclass have sustained as a result.

124.    The Archstone UPREIT and its successor in interest is the issuer of the securities issued and sold through the Registration Statement and Prospectus.  As the issuer of the securities, the Archstone UPREIT is strictly liable to Plaintiff and members of each subclass for the misstatements and omissions in the Registration Statement and Prospectus pursuant to which the new A-1 Units and Series O Units were issued, and for the damages that Plaintiff and other members of each subclass have sustained as a result.

125.    This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement and Prospectus that should have been made through the exercise of reasonable diligence, and within three years of their effective date.

126.    Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct alleged herein, each Defendant named in this Count violated Section 11 of the Securities Act.  As a direct and proximate result of Defendants' acts and omissions in violation of the Securities Act, Plaintiff and members of each subclass suffered substantial damage in connection with receipt of either the new A-1 Units or Series O Units pursuant to the Registration Statement and the Prospectus.

127.    By virtue of the foregoing, Plaintiff and members of the each subclass are entitled to recission and/or damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

128.    Plaintiff Infinity Clark Street Operating and members the Series O Subclass  seek rescission of their exchange and the return of the full protections afforded to them by the A-1 Units, and/or damages in the amount of the full value of the A-1 Units at the time of the Merger plus the value of the tax protections and other provisions that were provided to them as original A-1 Unit holders but that they did not receive as Series O Unit holders.

129.    Plaintiffs Katz and Stender and members the Cash-Out Subclass seek damages in the amount of the full value of the A-1 Units at the time of the Merger plus the value of the tax protections and other provisions that were provided to them as original A-1 Unit holders but that they did not receive as new A-1 Unit holders.

## COUNT II

## VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT
### (Against All Defendants)

130.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

131.    Plaintiff Infinity Clark Street Operating brings this count pursuant to Section 12(a)(2) of the Securities Act against all Defendants on behalf of the Series O Subclass, persons or entities who either exchanged their new A-1 Units for Series O Units pursuant and traceable to the Registration Statement and Prospectus.  At the time they acquired the new A-1 Units and exchanged them for Series O Units, Infinity and members of the Series O Subclass were without knowledge of the facts concerning the

materially false and misleading statements in the Registration Statement and Prospectus.

132.    Plaintiff Katz and Stender bring this count pursuant to Section 12(a)(2) of the Securities Act on behalf of the Cash-Out Subclass, persons or entities who acquired new A-1 Units issued pursuant to a Registration Statement signed by the Individual Defendants.  At the time Katz, Stender and members of the Cash-Out Subclass acquired the new A-1 Units and cashed out of those Units, they were without knowledge of the facts concerning the materially false and misleading statements in the Registration Statement and Prospectus.

133.    Each of the Defendants named in this Count were offerors and/or solicitors of the exchange of the shares offered pursuant to a Registration Statement and Prospectus, as defined in the Securities Act.  Specifically, all Defendants offered and/or solicited both the new A-1 Units and the Series O Units in the Merger to Plaintiff and members of each subclass by virtue of the Defendants' signing, preparation, solicitation and/or dissemination of the Registration Statement and Prospectus.

134.    The Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The Defendants' actions of solicitation included participating in the preparation and issuance of the false and misleading Registration Statement and Prospectus.

135.    The Defendants owed to the original A-1 Unit holders, including Plaintiffs, the duty to make a reasonable and diligent investigation of the statements contained in the offering materials related to the Merger, including the Registration Statement and

Prospectus contained therein, to ensure that such statements were true and that there was no omission to state a material fact required to be stated to make the statements contained therein not misleading. The Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the offering materials as set forth above.

136. Plaintiff and members of each subclass acquired either new A-1 Units or Series O Units pursuant to and/or traceable to the defective Registration Statement and Prospectus. Neither Plaintiff nor members of either subclass knew nor in the exercise of reasonable diligence could have known, the untruths and omissions contained in the Registration Statement and Prospectus.

137. By reason of the conduct alleged herein, Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of the materially false and misleading statements in the Registration Statement and Prospectus, Plaintiff and the other members each subclass have sustained substantial damage.

138. Plaintiff Infinity Clark Street Operating and members the Series O Subclass seek rescission of their exchange and the return of the full protections afforded to them by the A-1 Units, and/or damages in the amount of the full value of the A-1 Units at the time of the Merger plus the value of the tax protections and other provisions that were provided to them as original A-1 Unit holders but that they did not receive as Series O Unit holders.

139. Plaintiffs Katz and Stender and members the Cash-Out Subclass seek damages in the amount of the full value of the A-1 Units at the time of the Merger plus

the value of the tax protections and other provisions that were provided to them as original A-1 Unit holders but that they did not receive as new A-1 Unit holders.

## COUNT III

### VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### (Against the Individual Defendants)

140.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

141.    Plaintiff Infinity Clark Street Operating brings this count pursuant to Section 15 of the Securities Act against Individual Defendants and on behalf of the Series O Subclass, all persons or entities who exchanged their new A-1 Units for Series O Units pursuant and traceable to the Registration Statement.  At the time they acquired the new A-1 Units and exchanged them for Series O Units, Infinity and members of the Series O Subclass were without knowledge of the facts concerning the materially false and misleading statements in the Registration Statement and Prospectus.

142.    Plaintiff Katz and Stender bring this count pursuant to Section 15 of the Securities Act against the Individual Defendants and on behalf of the Cash-Out Subclass, persons or entities who acquired new A-1 Units issued pursuant to a Registration Statement signed by the Individual Defendants.  At the time Katz, Stender and members of the Cash-Out Subclass acquired the new A-1 Units and cashed out of those Units, they were without knowledge of the facts concerning the materially false and misleading statements in the Registration Statement and Prospectus.

143.    Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of the Archstone REIT and the Archstone UPREIT within the meaning of

Section 15 of the Securities Act. Individual Defendants had the power and influence, and exercised the same, to cause the Archstone REIT and the Archstone UPREIT to engage in the acts described herein that caused violations of law complained of herein and were able to and did control the contents of the Prospectus.

144.    Individual Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and each subclass.

145.    By virtue of the conduct alleged herein, Individual Defendants are strictly liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**COUNT IV**

**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
AND RULE 10b-5 PROMULGATED THEREUNDER
(Against All Defendants)**

146.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

147.    Plaintiff Infinity Clark Street Operating brings this count against all Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 and Rule10b-5 promulgated thereunder, on behalf of itself and all members of the Series O Subclass and who were damaged thereby.

148.    Plaintiffs Katz and Stender bring this count against all Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of themselves and all members of the Cash-Out Subclass and who were damaged thereby.

149.   As alleged in this complaint, Defendants, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mail, knowingly or recklessly engaged and participated in a continuous course of conduct to disseminate materially false and misleading information and to conceal adverse material information about the Merger.

150.   Defendants knowingly or recklessly employed devices, schemes and artifices to defraud Plaintiffs and both the Cash-Out Subclass and the Series O Subclass, while in possession of material, adverse non-public information, and engaged in acts, practices and a course of conduct that included the knowing and reckless making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about the Merger not misleading

## A. Defendants' Knowledge Of The Materially False and Misleading Statements and Omissions

151.   Because of their positions with both the Archstone REIT and the Archstone UPREIT, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Prospectus and Registration Statement, which misrepresented or failed to disclose, *inter alia*, the information set forth below.

152.    Defendants knew or recklessly disregarded that Defendants' public statements failed to disclose material information concerning the effects of the Merger. In addition, Defendants knew or recklessly disregarded that the public statements complained of were materially false and misleading for the reasons alleged.

153.    Defendants had the ability to, and did, cause the complained of public statements to contain material misstatements and omissions of material facts.

154.    The Individual Defendants were directors and officers of the Archstone REIT and the Archstone UPREIT and, therefore, were directly responsible for the material omissions and false and misleading statements disseminated to the public through financial statements, press releases, news reports, and filings with the SEC which they prepared, reviewed and/or signed.   Some or all Individual Defendants had direct responsibility for the preparation of the Registration Statement and Prospectus, as well as the Archstone REIT's Annual Reports on Form 10-K, Forms 10-Q and 8-K.

**B.  Scienter.**

155.    As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the REIT and UPREIT were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

156.    As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the Merger, their control over,

and/or receipt and/or modification of the allegedly materially misleading misstatements and/or their associations with the REIT and UPREIT which made them privy to confidential proprietary information concerning the Archstone REIT and the Archstone UPREIT, were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

157. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the REIT and UPREIT, including Defendants.

158. As particularized herein, Defendants' public statements regarding the REIT's and UPREIT's acquisitions, operations, revenue, income, client and employee relations, the Merger, and overall financial position were lacking in a reasonable basis at all relevant times. Defendants issued a series of public statements announcing strong revenue and overall financial well-being.

159. Defendants possessed substantial motives for misrepresenting the effects of the Merger and future prospects throughout the Class Period. The Individual Defendants had further motivation to engage in the fraud detailed herein.

160. Immediately after the forced elimination of the A-1 common units, the Archstone REIT, in conjunction with and at the direction of Tishman and Lehman, caused billions of dollars in assets held by the Archstone UPREIT to be distributed to the Archstone REIT as part the of the merger consideration. This distribution could not

have been effected had the A-1 Unit holders been permitted to retain their A-1 interests in the Archstone UPREIT.

161.    After further leveraging and looting the assets of the Archstone UPREIT and relinquishing them for the benefit of the buyer parties, the Archstone REIT merged into the Tishman-Speyer Trust, which became the sole trustee of the Archstone UPREIT.  The sole purpose of leveraging the assets was to permit an impermissible distribution to the A-2 Unit holders (the Archstone REIT's interests in the Archstone UPREIT) to fund the acquisition of trustee the Archstone REIT.

162.    Tishman and Lehman made clear that the Merger could not have succeeded if the A-1 Unit holders had been treated like the A-2 Unit holder and allowed to retain their interests.  Thus, the Archstone REIT forced the A-1 Unit holders out of their interests and rights in the Archstone UPREIT and the Archstone UPREIT's assets so that it could itself take full advantage of those assets (and the leveraging opportunities they provided), to the exclusion of the A-1 Unit holders, in order to fund its own blockbuster acquisition and enrich the Individual Defendants.

163.    Tishman and Lehman accomplished their acquisition of the Archstone REIT, which cost over $22 billion, with equity contributions of only $250 million each. The remainder of the purchase price came from a bridge-equity loan of approximately $4.6 billion, and new debt, for which the assets held in the Archstone UPREIT would serve as security, of approximately $15.2 billion obtained as a result of Tishman and Lehman's decision to substantially leverage the properties held in the Archstone UPREIT.

164.   The new debt included a purchase by Fannie Mae of a $7.1 billion credit facility secured by 105 properties that were part of the transaction, and a $1.8 billion structured transaction executed by Freddie Mac.  The Archstone REIT acknowledged that this "high degree of leverage could adversely affect [its] ability to obtain additional financing" and that it "may not have sufficient cash flow from operations or capital transactions to service [its] indebtedness."

165.   The Individual Defendants, as executive officers and individual trustees of the Archstone REIT, stood to, and did, reap enormous financial benefits from the Merger and accordingly acted in their personal self-interest to the degradation of the interests of the A-1 Unit holders, including the Plaintiffs.  The individual trustees owned considerable positions in the Archstone REIT and therefore stood to profit individually from the increase in value to the Archstone REIT created by abandoning the interests of the A-1 Unit holders and closing the Merger  They also stood to profit, and did profit, in their own right as well.

166.   Before the Merger, the Archstone REIT recognized that its "executive officers and the company and its board of trustees may be deemed to have interests in the [transaction] that are in addition to or different from the interests of [its] unit holders generally…."   More specifically, the Archstone REIT acknowledged that one of the reasons *not* to go forward with the transaction (though A-1 Unit holders had no choice) was "the fact that some of the company's trustees and [its] executive officers may have interests… that are different from, or in addition to, those of [its] Class A-1 common unit holders."  Notwithstanding the conflict, no disinterested group was designated to review the Merger on behalf of the A-1 Unit holders.

167.   In order to ensure that the personal interests of their executive officers were protected following the Merger, the Archstone REIT entered into a change of control agreement with each officer.   These agreements provided lucrative severance payments and other benefits to the officers upon completion of the Acquisition.   While the Archstone REIT adopted specific measures to protect the interests of its officers, it simultaneously took affirmative steps to injure the interests of the A-1 Unit holders.

168.   Sellers, the Archstone REIT's CEO, stood to receive more than $26.5 million in aggregate consideration in the merger stemming from options and restricted shares he owned that would vest with the merger.   He received an additional $17.7 million in deferred compensation that would come due upon the Merger.   Moreover, Sellers was guaranteed that he would serve as the CEO of the surviving entity and would be guaranteed at least $4.75 million in salary and bonus for 2008.    In comparison, Sellers had earned $750,000 in salary and no bonus in 2007 and $750,000 in salary and $1.75 million in bonus in 2006.

169.   Sellers' total yearly compensation thus increased dramatically as a result of the Merger, even excluding the substantial one-time payments he received as a result of the Merger.

170.   With a financial windfall hanging in the balance, Sellers had a keen personal interest in ensuring the closing of the Merger (even if it meant the vitiation of the rights of the Plaintiffs and other A-1 Unit holders).   Prior to the closing of the transaction, the Archstone REIT acknowledged that one of the reasons not to go forward with the transaction was "the fact that the buyer parties were willing to pursue

[the transaction] … *only* if they and Mr. Sellers negotiated and entered into a binding arrangement regarding his future employment."

171.    The trustees who voted to approve the Merger on the Archstone REIT's behalf stood to receive more than $4.7 million in aggregate consideration in the merger stemming from options and restricted shares they owned and that would vest with the merger.  These trustees therefore also had a direct financial interest in ensuring that the Merger closed, even if it did so at the expense of the A-1 Unit holders.

172.    In this scheme, Defendants profited handsomely at the expense of the A-1 Unit holders.  By squeezing out the A-1 Unit holders – and knowingly and intentionally disregarding their rights under the Declaration of Trust and Contribution Agreements – Defendants were able to fully leverage the assets held in the Archstone UPREIT and fund the $22 billion deal.

173.    In addition, Defendants maximized their payout from the transaction. Tishman and Lehman used the Archstone REIT's obligations under the Contribution Agreements as both sword and shield.  Not only were they able to obtain a savings of $900 million on the purchase price, but also they refused to pay the hundreds of millions of dollars to the Plaintiffs, and other A-1 Unit holders, as agreed under the Contribution Agreements.

174.    While the Plaintiffs' A-1 interests were taken from them, the Archstone REIT's interests in the Archstone UPREIT (the A-2 common units) continued in full force after the Merger.  The A-2 Unit holder was allowed to maintain its full beneficial interest in the Archstone UPREIT and the properties held in the Archstone UPREIT, was permitted a distribution of billions of dollars of cash and assets from the Archstone

UPREIT to hold and dispose of without regard for the interests of the A-1 Unit holders, did not have to "choose" between a reduced-value taxable cash payment or a substantially devalued alternate security, and was able to leverage the assets of the Archstone UPREIT to fund its own acquisition.

175.    Despite the equality of interests guaranteed by the Declaration of Trust, A-1 and A-2 units in the Archstone UPREIT were treated drastically differently during the Merger.  Thus the Archstone REIT protected its own interests by preserving the value of its A-2 units, while stripping the value of the interests of the Plaintiffs, and other A-1 Unit holders.

176.    In fact, the Archstone REIT recognized, again in its Information Statement, that one of the reasons *not* to go forward with the transaction (on which A-1 Unit holders had no choice) was "the fact that [it was] not offering to the Class A-1 common unit holders an opportunity to remain as common unit holders... thereby precluding [them] from having the opportunity to fully participate in the future performance of [its] assets, any future earnings growth, or any future appreciation in the value of [its] properties."

177.    Defendants induced the Plaintiffs to contribute their properties to the Archstone UPREIT with the express promises that the Plaintiffs would control the timing of any tax recognition associated with any deferred taxable gain, that the Plaintiffs' interests would be treated the same as the Archstone REIT's interests, and that the Plaintiffs would have specified rights to redeem their interests, to receive distributions, to share in the profits and growth of the Archstone UPREIT's assets, to receive debt allocations, and to provide or withhold their consent to actions adversely affecting their interests or to other certain amendments to the Declaration of Trust.

178.   Yet the Archstone REIT – in concert with the other Defendants – actively sought to, and ultimately did, repudiate its obligations to the Plaintiffs by engaging in the Merger.   Acting for their own self-interest, Defendants forced the Merger on the Plaintiffs, stripped the Plaintiffs of their A-1 Units without seeking the A-1 Unit holders' consent, and schemed to maximize their take from the deal by requiring the Plaintiffs to accept the newly created, inferior Series O Units or the cash consideration and its attendant tax liabilities.

179.   Although Defendants were fully aware of their obligations under the Declaration of Trust and Contribution Agreements, and cited those obligations in justifying the reduced purchase price for the Archstone REIT, Defendants repudiated those obligations altogether, and subsequently issued an amended and restated Declaration of Trust that wrote out of existence the A-1 Units and their associated rights.

180.   As a result of Defendants' wrongful conduct, Plaintiffs have suffered substantial damage, including the economic loss arising from the forced taking of their A-1 Units, the economic loss arising from the forced tax liabilities that Defendants' improper actions necessarily triggered, the "election" of virtually worthless O Series Units by Plaintiff Infinity and certain Class Members, and the economic loss arising from Defendants' complete abrogation of Plaintiffs' rights as A-1 Unit holders, and under the Declaration of Trust and Contribution Agreements.

181.   As a result of the deceptive practices, common schemes and artifices, and false and misleading statements and material omissions alleged herein, the price of Archstone REIT's common stock was artificially inflated.   Pursuant to the Registration Statement and Prospectus, each original A-1 Unit was fundamentally changed, thereby

becoming a new and distinct A-1 Unit, which were eligible only to be cashed out or exchanged for Series O Units on a one-for-one basis.  As a result of the price of the Archstone REIT's common stock being artificially inflated due to Defendants' false and misleading statements and fraudulent conduct alleged herein, and as a result of Defendants' actions whereby the original A-1 Units lost their tax protection, liquidity and other valuable attributes, Plaintiffs and members of the Cash-Out Subclass and Series O Subclass were deceived as to either (a) the true value of their new A-1 Units; or (b) the true value of the Series O Units they agreed to receive in exchange for each new A-1 Unit.

182.    As a result, Plaintiffs and the Cash-Out Subclass and Series O Subclass were injured in that they either cashed out their new A-1 Units or exchanged their new A-1 Units for Series O Units, the value of which Defendants materially misrepresented from the outset.  Had it not been for the fraudulent conduct alleged herein, neither Plaintiffs nor any member of the Cash-Out Subclass or the Series O Subclass would have been damaged as alleged herein.

183.    In ignorance of the false and misleading statements, the material omissions and the deceptive and manipulative devices and contrivances employed by the Defendants, Plaintiffs and members of each subclass relied on the integrity of the market in the Archstone REIT's common stock to ascertain the value of the new A-1 Units, as well as the underlying Series O Units, owing to the direct and/or the statements complained of herein, when either cashing out the new A-1 Units or acquiring Series O Units.

184.   As a result, Plaintiffs and members of the Cash-Out Subclass and Series O Subclass suffered substantial damages in an amount to be proven at trial.

185.   Under the federal securities laws, Plaintiffs' and subclass members' cash out of new A-1 Units or exchange of A-1 Units for Series O Units constituted a sale for purposes of claims made under the Exchange Act.

186.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Plaintiffs and members of the Cash-Out Subclass and Series O Subclass in connection with their cash out of the new A-1 Units or exchange of those Units for Series O Units.

## COUNT V

## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
## AGAINST THE INDIVIDUAL DEFENDANTS

187.   Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

188.   This Count is asserted against all Defendants for violations of Section 20(a) of the Exchange Act on behalf of Plaintiffs and all members of the Cash-Out Subclass and Series O Subclass who either cashed out their new A-1 Units or exchanged those units for Series O Units and were damaged thereby.

189.   This claim for relief is brought against the Individual Defendants.

190.   As alleged herein, the Archstone REIT and the Archstone UPREIT are liable to Plaintiffs and members of the Cash-Out Subclass and the Series O Subclass who either cashed out their new A-1 Units or acquired Series O Units securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 20(a) of the Exchange Act.

191.   The Individual Defendants were controlling persons in the Archstone REIT and the Archstone UPREIT within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the Archstone REIT's and the Archstone UPREIT's fraud and violation of the federal securities laws, as detailed herein.

192.   The Individual Defendants exercised control over the Archstone REIT and the Archstone UPREIT by virtue of, among other things, their positions within the Archstone REIT and the Archstone UPREIT, the key roles they played within the Archstone REIT and the Archstone UPREIT, and their involvement with the Archstone REIT's and the Archstone UPREIT's public disclosures.

193.   This claim was brought within two years after the discovery of this fraud within five years of the making of the statements alleged herein to be materially false and misleading.

194.   By virtue of the forgoing, the Individual Defendants are liable to Plaintiffs and members of the Cash-Out Subclass and Series O Subclass, each of whom has been damaged as of result of the Archstone REIT's and the Archstone UPREIT's underlying violations.

## DEMAND FOR JURY TRIAL

195.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues so triable.

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.  Declaring that this lawsuit is properly maintainable as a class action, and certifying Plaintiffs as representatives of the Class;

B.  Declaring that Defendants violated applicable federal securities laws;

C.  Awarding compensatory damages in favor of Plaintiffs and the other Class Members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon at the maximum rate allowable by law;

D.  Awarding rescissory damages against Defendants, jointly and severally, and/or ordering recission on behalf of Plaintiff Infinity Clark Street Operating and members of the Series O Subclass;

E.  Awarding Plaintiffs and the Class their costs and disbursements and reasonable allowances for Plaintiffs' counsel and experts' fees and expenses; and

F.  Granting such other and further relief as may be just and proper.

DATED:  August 12, 2009

JACK P. KATZ, STEVEN A. STENDER AND INFINITY CLARK STREET OPERATING, on behalf themselves and all others similarly situated,


By:  /s/ Kenneth A. Wexler
     Kenneth A. Wexler
     Edward A. Wallace
     Christopher J. Stuart
     Donald P. Bunnin
     **WEXLER WALLACE LLP**
     55 W. Monroe Street, Suite 3300
     Chicago, Illinois 60603
     Telephone:  312-346-2222

     Lee Squitieri
     **SQUITIERI & FEARON, LLP**
     32 E. 57th Street, 12th Floor
     New York, New York 10022
     Telephone:  212-421-6492

     Gerald L. Bader, Jr.
     **BADER & ASSOCIATES, LLC**
     14426 E. Evans Avenue, Ste 200
     Denver, Colorado 80014
     Telephone:  303-534-1700

     ***Counsel for Plaintiffs***

Plaintiffs' addresses:

Jack P. Katz
1500 Sheridan Road
Wilmette, IL  60091

Steven A. Stender
900 Elm Place
Glencoe, Illinois 60022

Infinity Clark Street Operating
20 N. Wacker Drive, Suite 1725
Chicago, Illinois 60606

## CERTIFICATE OF SERVICE

I, Christopher J. Stuart, hereby certify that I electronically filed the foregoing *Amended Class Action Complaint* with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Gerald L. Bader, Jr.
Renee Beth Taylor
Bader & Associates, P.C.
1873 S. Bellaire St., Suite 1110
Denver, CO  80222
gbader@bader-associates.com
rtaylor@bader-associates.com

Olympio Lee Squitieri
Squitieri & Fearon, LLP
32 E. 57th Street, 12th Floor
New York, NY  10022
lee@sfclasslaw.com

Frederick J. Baumann
Alex C. Meyers
Rothgerber Johnson & Lyons, LLP
1200 17th Street
One Taboe Center, #3000
Denver, CO  80202-5855
fbaumann@rothgerber.com
ameyers@rothgerber.com

Dated:  August 12, 2009

By:  /s/ Christopher J. Stuart
    Christopher J. Stuart
    Wexler Wallace LLP
    55 W. Monroe Street, Suite 3300
    Chicago, Illinois 60603
    (312) 346-2222 – Telephone
    cjs@wexlerwallace.com